UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No: 22-cr-237 (RBW) |
| v. | : | |
| | : | |
| GEORGE HAYWOOD, | : | Sentencing: November 9, 2022 |
| | : | |
| Defendant. | : | |

### UNITED STATES' SENTENCING MEMORANDUM

The Defendant, George Haywood, a seasoned investor, agreed to receive non-public information about a biotechnology stock he owned in exchange for a commitment not to use the information for his own personal gain. He immediately broke that promise by selling the stock to avoid a significant loss. In doing so, he committed insider trading and abused the trust placed in him by others as a financial services professional. This Court should sentence the Defendant to a United States Sentencing Guidelines sentence of 27 months' incarceration, at the midpoint of the applicable Guidelines range, coupled with three years of supervised release. He also should be ordered to pay a fine of $657,402.31, and to forfeit $328,701.16, consistent with the plea agreement between the parties.

### BACKGROUND

The Defendant lives and works in the District of Columbia, where he is a long-time independent financial services professional who manages investments on behalf of friends and family. (PSR ¶¶ 10-12.) At the beginning of January 2020, he effectively controlled ten brokerage accounts at Stifel, Nicolaus & Company ("Stifel"), a clearing brokerage house

headquartered in St. Louis, Missouri.[1] (Dkt. 7 ¶ 4.) The accounts were either in his name, or that of his family members or a close friend.[2] (PSR ¶ 11.)

Neurotrope, Inc. ("Neurotrope"), now known as a Synaptogenix, was a clinical testing stage biopharmaceutical and diagnostics company. Josh Silverman was the company's Chairman. (PSR ¶ 15.) Between November 6, 2019, and January 21, 2020, the Defendant, through the brokerage accounts held at Stifel, purchased approximately 1.7 million shares of Neurotrope stock. (PSR ¶ 17.) On the final day of that period – January 21, 2020 – accounts controlled by the Defendant purchased 93,000 shares of Neurotrope that had a net cost of approximately $124,955. (PSR ¶ 17.)

The next day, January 22, 2020, at approximately 9:00am, Neurotrope announced that it was being awarded a $2.7 million grant from the National Institutes of Health following positive clinical trial results for a medicine for the treatment of Alzheimer's disease. (PSR ¶ 19.) When trading on the stock market opened on the morning of January 22, 2020, the opening price for Neurotrope was $2.26 per share. (PSR ¶ 18.) But, with the news of the NIH clinical trial results, Neurotrope's stock price quickly increased to a high of $3.85 per share. (PSR ¶ 19.) That rapid price spike meant that the Defendant's Neurotrope holdings had increased in market value by approximately $2.7 million in just a few hours.

At approximately 12:50pm that same day, the Defendant received a phone call from Josh Silverman, the Chairman of Neurotrope. (PSR ¶ 20.) Silverman told the Defendant that he wanted to share non-public information about the company with the Defendant. (PSR ¶ 11.)

---

[1] Those ten accounts had the following numbers: X1839, X1559, X1191, X4530, X6951, X5116, X6471, X2712, X6189, and X9071. (PSR ¶ 13.)

[2] One of the accounts was held in the name of a D.C. Superior Court Judge, and therefore subject to heightened scrutiny by financial institutions, because of the judge's status as a potentially political exposed person.

Silverman cautioned the Defendant, however, that Silverman could only share such information if the Defendant agreed not to execute or attempt to execute any Nuerotrope trades until the information became public. (PSR ¶¶ 11.) The Defendant agreed to those preconditions. (PSR ¶ 12.) Silverman then informed the Defendant that Neutrope planned to issue a registered direct offering ("RDO") later that day and Silverman invited the Defendant to be one of the initial investors. (PSR ¶ 12.)[3] Silverman followed the phone call with a series of emails outlining the specific terms of the RDO and memorializing the Defendant's agreement not to trade Neurotrope shares until news about the RDO became public.[4] (PSR ¶¶ 22-23, 26.) Phone records obtained by the government show that the Defendant's phone call with Silverman was nine minutes long and ended at around 12:59pm.

When that call ended, the Defendant immediately knew that the announcement of an RDO later that day "would cause the price of [Neurotrope's] shares to drop once it became public." (Dkt. 7 ¶ 15; PSR ¶ 24.) At approximately 12:59:20pm and 12:59:37pm, the Defendant called his broker at Stifel in an effort to sell off his Neurotrope holdings before news of the RDO could become public. (PSR ¶ 24.) And during the next hour, the Defendant called Stifel to place a series of orders to sell shares of Neurotrope from accounts that he controlled. (PSR ¶¶ 25, 27-32.) Haywood successfully sold 105,197 shares with realized gross gains of $328,701.16—

---

[3] In a registered direct offering, a company offers shares of its securities directly to pre-identified investors. RDOs are often a way for public companies to raise capital when traditional public offerings and private investment might not be feasible. When more shares of a company's stock are placed into the market, a stock's price will generally drop in the short term because of market dilution, *i.e.*, there is a greater supply of the company's shares with no change (or a decrease) in the demand for those shares.

[4] Silverman's email memorializing their agreement was explicit: "[A]s an inducement to obtain confidential investment information, this will confirm that you have agreed to keep the information to be disclosed/discussed as confidential and have agreed to not disclose the content of this information to any party not bound by our agreement. Furthermore, you agree not to use the information presented in connection with any investment outside the nature and scope of the proposed investment opportunity. This agreement shall terminate at the earliest of the public release of the information discussed or the completion/termination of the proposed offering." (PSR ¶ 22.)

although Haywood tried to sell more than 600,000 shares of Neurotrope including all of the shares in his personal account. (PSR ¶ 33.)

At approximately 2:05pm, Neurotrope publicly announced an $18 million RDO. (PSR ¶ 33.) As Haywood had correctly predicted based on his call with Silverman, the company's stock price dropped dramatically. Neurostrope's stock price closed at $1.42 per share which was even less than the market price of the stock when trading opened that day. (PSR ¶¶ 18, 33.) By trading on inside information, the Defendant avoided losses of $179,297.18 on shares of Neurotrope that he sold ahead of the RDO announcement based on the closing price that day. (PSR ¶ 34.) Had the defendant been successful at selling all 600,000 shares he attempted to sell ahead of the RDO announcement, he would have avoided losses of over $900,000. (PSR ¶ 35.)

On July 26, 2022, the Defendant pleaded guilty to an Information charging him with one count of Insider Trading, in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5. (PSR ¶ 1.) In entering his plea, the Defendant acknowledged such a crime carries a statutory maximum penalty of 20 years' incarceration, and a three-year term of supervised release, a fine of $5,000,000 or twice the pecuniary gain or loss of the offense. (PSR ¶ 4.) As part of the plea agreement, the defendant has agreed to the entry of a forfeiture money judgment in an amount not greater than $328,701.16 and an amount not less than $179,287.18. (PSR ¶ 8.)

## SENTENCING GUIDELINES

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for

sentencing. *Id*. at 49. Although the Guidelines are advisory, sentencing courts "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 261 (2005).

The parties agree that the following Guidelines apply:

| U.S.S.G. Provision | Description | Levels |
|---|---|---|
| § 2B1.4(a) | Base offense level | 8 |
| § 2B1.4(b)(1) | Gain resulting from offense more than $150,000 | +10 |
| § 3B1.3 | Abuse of Trust/Special Skill | +2 |

(PSR ¶¶ 5, 40-46.) Accordingly, the adjusted offense level is 20. (PSR ¶ 46.) The Government further agrees that a 2-level reduction is appropriate, pursuant to U.S.S.G. § 3E1.1, because the Defendant demonstrated acceptance of responsibility. (PSR ¶ 48.) The Government also agrees that an additional 1-level reduction is appropriate, pursuant to U.S.S.G. § 3E1.1(b), because the Defendant provided timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. (PSR ¶ 49.) The Defendant's Total Offense Level is 17. (PSR ¶ 50.)

The U.S. Probation Office calculated that the Defendant's criminal history score is zero. (PSR ¶ 53.) That score places the Defendant in Criminal History Category I. (PSR ¶¶ 53, 109.) Accordingly, if the total offense level is 17 and the Criminal History is Category I, as the parties submit, the Guidelines recommend a sentence of 24 months to 30 months of incarceration ("Guideline Range"). (PSR ¶ 109.) The Defendant is not eligible for probation. (PSR ¶ 118.)

**SENTENCING FACTORS UNDER 18 U.S.S.C. § 3553(a)**

Once the Court calculates the defendant's advisory Guideline Range, it should consider the various factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49-50. In its evaluation, the Court may consider all factual evidence relevant to the conduct of conviction that is proven by a preponderance of the evidence, including evidence not presented to the jury, without regard to the

5

rules of admissibility at trial. *See United States v. Bell*, 795 F.3d 88, 103 (D.C. Cir. 2015) (citing *Rita v. United States*, 551 U.S. 338, 352 (2007)); U.S.S.G. § 6A1.3(a) ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

With respect to the factors enumerated in 18 U.S.C. § 3553(a), of particular relevance here are the "nature and circumstances of the offense," the need for the sentence "to reflect the seriousness of the offense" and provide "just punishment," "the history and characteristics of the defendant," the need "to promote respect for the law," the need to "avoid unwarranted sentence disparities," and the need for the sentence "to afford adequate deterrence to criminal conduct." 18 U.S.C. §§ 3553(a)(1), (a)(2)(A), (a)(2)(B), (a)(6), (a)(7). As discussed further below, these factors weigh decidedly in favor of a substantial period of incarceration at the mid-point of the Guideline Range.

<u>Nature and Circumstances of the Offense, and its Seriousness</u>

The seriousness of the Defendant's crime is beyond question. A fundamental purpose of securities law is to ensure fair dealing and to outlaw deceptive and inequitable practices in the securities markets. The integrity of capital markets is critical to the functioning of the nation's economy, which depends upon well-functioning markets for liquidity and access to capital. Insider trading erodes market integrity by undermining the public's confidence in the capital markets and—even worse—by suggesting cynically to ordinary investors that they should not invest in the stock market because the markets are rigged by insiders like Haywood.

In some respects, the Guidelines actually understate the seriousness of the Defendant's crime. When the Defendant sold his shares of Neurotrope based on inside information revealing that the stock price was about to drop dramatically, other investors purchased the stock from the Defendant without the Defendant disclosing material information. Those purchasers bore the pain of losses that the Defendant avoided and are, in a sense, real victims of the scheme. But unlike the guideline for financial crimes, the applicable Sentencing Guideline for insider trading requires the offense score to be determined only with reference to the "gain resulting" from the crime and does not recognize any upward adjustment for the number of victims of the scheme. *Cf.* U.S.S.G § 2B1.1(b)(1) (recognizing three different upward adjustments based on the number of victims).

Moreover, even when applying U.S.S.G. § 2B1.4, the Guideline's reliance on "gain resulting" from the crime is divorced from the offender's intent. For example, in the case at bar, the Defendant actually tried to sell off more than 600,000 shares of Neurotrope before the announcement of the RDO became public, but was only successful in selling 105,197 shares. Had the Defendant succeeded in fully executing his scheme, he would have had gains of more than $1.4 million. (Ex. 1 ¶ 5.) But the guideline for insider trading, unlike the guideline for general financial fraud, uses the lesser amount of "gain resulting" ($328,701) which is less than one-fourth of the illicit gains the Defendant actually hoped to make. *Cf.* U.S.S.G. § 2B1.1(b)(1), Application Note 3 ("[L]oss is the greater of actual loss or intended loss.")

The defendant violated the trust placed in him by friends and family members as a financial services professional. One of those persons was a D.C. Superior Court Judge who trusted Haywood to make investments on their behalf. Those persons believed the Defendant would exercise discretion and integrity in managing their money. But the Defendant betrayed that trust when he used their money—including the judge's money—to further his crime.

7

All of these facts weigh in favor of a sentence at the midpoint of the Guideline Range.

History and Characteristics of the Defendant

The Defendant has been blessed with more good fortune than most others who find themselves in the criminal justice system. He grew up in a stable home with two parents who worked as high school teachers in Washington, D.C. (PSR ¶ 59.) He had a "terrific" upbringing with a "stable, loving family and experienced a normal, happy childhood." (PSR ¶ 61.) After graduating from St. Alban's School, he attended Harvard where he received a Bachelor of Arts degree in Biology. (PSR ¶ 80.) He then attended Harvard Law School. (PSR ¶ 80.) He has worked as a hedge fund portfolio manager at Moore Capital Management and as a corporate bond trader at Lehman Brothers. (PSR ¶¶ 83-84). And he has a deep network of powerful personal contacts accumulated from decades of work as an investor, corporate director,[5] and board member for non-profit organizations. (PSR ¶¶ 88.) As an article in The New York Times once noted: "[I]t was Mr. Haywood whom then-Senator Obama turned to in early 2005 when he needed a broker to help manage money from a book deal."[6]

Notwithstanding the success, income, and status he held, the Defendant decided to cheat the stock market to gain even greater wealth. And the facts in this case show that he did so with unmistakable intent to break the law. The Defendant finished his phone call with Silverman in which he received material non-public information at 12:59pm. Before 1:00pm—less than 60 seconds later—the Defendant had already placed two phone calls to Stifel in an effort to sell his

---

[5] Although not mentioned in the PSR, the Defendant has served on the Board of Directors of Fannie Mae, Denny's Corporation, and XM Satellite Radio Holdings, Inc. *See, e.g.,* Fannie Mae Press Release, "Fannie Mae Names George Haywood, Finance and Technology Entrepreneur, to the Board of Directors," Nov. 28, 2016 (available at https://www.prnewswire.com/news-releases/fannie-mae-names-george-w-haywood-finance-and-technology-entrepreneur-to-the-board-of-directors-300369185.html) (accessed Oct. 26, 2022).

[6] Christopher Drew and Mike McIntire, "After 2000 Loss, Obama Built Donor Network from Roots Up," The New York Times (April 3, 2007.)

Neurotrope stock before the price dropped. (Dkt. 7 ¶ 15.) The Defendant immediately knew the value of the inside information and responded with deliberate urgency; he knew exactly what had to be done—a selloff—and placed the calls within seconds.

This level of sophistication and clear corrupt intent raise the specter that the Neurotrope trades were not a single act of aberrant conduct. Indeed, law enforcement has identified other instances where the Defendant has engaged in curiously timed stock transactions just ahead of market-moving news.[7]

***Denny's Corporation***. For example, between June 25, 2020, and June 29, 2020, the Defendant took a short position[8] of 160,000 shares in Denny's Corporation, a company where he once served on the board of directors, with a total value of $1,585,250.23. (Ex. 1 ¶¶ 19-25.) On June 30, 2020—just one day later—Denny's announced a public stock offering that caused the company's stock price to drop. (Ex. 1 ¶¶ 26-27.) Then on July 2, 2020, the Defendant repurchased the shares in transactions that generated a realized gain of $80,282.16.

On June 24, 2020, the day before the Defendant began taking his short position on Denny's stock, phone records show that the Defendant was in contact with a current Denny's board member by phone and text message. (Ex. 1 ¶ 19.) The FBI has analyzed the Defendant's trading records with multiple financial institutions. The Defendant had no history of trading Denny's securities prior to June 25, 2020. (Ex. 1 ¶ 29.)

---

[7] The Government informed defense counsel that it would raise these matters with the court at sentencing prior to the Defendant's guilty plea in July 2022. These instances are directly relevant to sentencing, but the government does not believe they are "relevant conduct" for purposes of U.S.S.G. § 1B1.3 because they relate to stock trades other than the offense of conviction.

[8] A "short" or a "short position" occurs when a trader sells a security first with the intention of repurchasing it or covering it later at a lower price. A trader would typically short a stock when they believe that the price of that stock will drop in the near future. In such a transaction, the short seller would usually borrow shares of stock from an investment bank or other financial institution, paying a fee to essentially "borrow" the shares while the short position is in place.

***Adverum Biotechnology.*** Similarly, between May 1, 2020, and May 4, 2020, accounts controlled by the Defendant purchased 90,778 shares of stock in Adverum Biotechnology ("Adverum") at a price per share ranging from $11.75 to $12.95, for a total cost of approximately $1,128,890. (Ex. 1 ¶¶ 11-13.) During the same time period, the Defendant purchased 1,449 call options for Adverum at strike prices ranging from $10 to $15 per share with an expiration date of May 15, 2020. (Ex. 1 ¶¶ 10, 14.)

On May 4, 2020, at 5:10pm, after the markets closed that day, Adverum reported positive results from a clinical trial of a gene therapy drug, resulting in the stock price jumping over $6 per share. (Ex. 1¶ 15.) Over the next two days, May 5 and May 6, 2020, accounts controlled by Haywood liquidated all of the Adverum stock holdings that had been purchased just days earlier at a range of $18.80 and $22.55 per share for total gains of approximately $1,897,786. (Ex. 1 ¶ 16.) The Defendant also sold all the call options he had purchased for total gains of more than $1.6 million. (Ex.1 ¶ 18.)

Just before the Defendant made his first Adverum transactions on May 1, 2020, the Defendant spoke for over an hour on the phone with Person 1 who is the managing partner for an investment firm. (Ex. 1 ¶¶ 8-9.) Person 1 had just one day earlier been in contact with an Executive Director for Adverum, who had learned of positive trial results on April 23, 2020 and May 1, 2020. (Ex. 1 ¶¶ 8-9, 15.)

\*     \*     \*

The pattern here is clear. The Defendant has repeatedly taken massive positions in securities just ahead of significant market-moving events. On each occasion discussed here, the Defendant did so right after he spoke to people who were privy to material non-public information

about the companies, or who may have received a tip from someone who was privy. And the Defendant made money—lots of money—from those trades by cashing out quickly.[9]

The Defendant's motive was simple. Greed. And the Defendant found it was easier to trade on insider information that he learned from people like Silverman than it was to earn the money honestly. Indeed, the government submits that the Defendant would still be exploiting his network of personal and professional contacts as a short cut to greater financial returns had he not been caught by law enforcement for the Neurotrope trades. These personal characteristics of the Defendant suggest that a substantial period of incarceration at the midpoint of the Guideline Range is an appropriate sentence.

Promotion of Respect for the Law,
Deterrence, and Avoiding Disparities

The sentence must also afford adequate deterrence. Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010). It is plain from the Defendant's conduct—the immediate corrupt use of material non-public information after promising not to do so—that a Guideline sentence for the Defendant is necessary to afford specific deterrence and promote respect for the law.

But general deterrence is also necessary. The legislative history of Section 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No.

---

[9] The government has invited the Defendant on multiple occasions since February 2022 to explain his trading practices, and to discuss the transactions involving Denny's and Adverum. To date, the Defendant has refused to meet with the government, even when the government offered assurances that any statements made by the Defendant during the meeting would be "off the record" and could not be used against him.

98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 382, 3259); *see also United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of [general] deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

As the facts in the Defendant's case indicate, insider trading is a highly lucrative crime with the potential for the offender to earn enormous gains in a short period of time. Should the Defendant receive a light sentence, financial professionals may be emboldened to engage in similar schemes believing that even if they are caught they will receive only minimal punishment. And a light sentence—in particular, a sentence below the Guideline Range—would erode public confidence in the markets by sending the message that even when elite professionals are caught making illegal trades, they are only lightly punished. *See United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) ("As this Court has repeatedly noted in other cases, insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail."); *United States v. Blackwell*, 459 F.3d 739, 774 (6th Cir. 2006) (general deterrence is appropriate in insider trading cases).

The Government's recommendation is that the Defendant should be sentenced to a period of incarceration at the mid-point of the Guideline Range, *i.e.*, a period of 27 months. Such a sentence is consistent with other sentences for insider trading by professionals and would not create an unwarranted sentencing disparity. *See, e.g., United States v. Walter C. Little*, No. 17-CR-450-IKPF (S.D.N.Y. April 20, 2018) (law firm partner; 27-month sentence); *United States v.*

*Christopher Collins*, No. 18-CR-567 (S.D.N.Y. Jan. 31, 2020) (former board member; 26-month sentence); *United States v. Viky Bohra*, No. 20-CR-165-JLR (W.D. Wa. June 10, 2021) (former program manager and engineer; 26-month sentence); *United States v. Dov Malnik*, No. 19-CR-714-VM (S.D.N.Y. Nov. 23, 2021) (securities trader; 30-month sentence).  Consequently, the Government's recommended sentence in this case would be in line with the types of sentences that courts have found appropriate in other insider trading cases.

## RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.  The Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), requires restitution in certain federal cases.  Here, the plea agreement does not include a specific provision requiring restitution.

The government submits that, in theory, any individuals who purchased shares of Neurotrope sold by the Defendant on January 22, 2022, between 12:59pm and 2:05pm without the benefit of material non-public information known to the Defendant potentially "suffered a pecuniary loss."  18 U.S.C. § 3664(c)(1)(B).  However, the government submits that "the number of identifiable victims is so large as to make restitution impracticable" and determining any restitution amount would involve "complex issues of fact related to the case or amount of the victim's losses."  18 U.S.C. § 3664(c)(3).

For example, Haywood sold more than 100,000 shares of Neurotrope during the critical time period.  Those purchasers may have themselves re-sold the shares ahead of the announcement at 2:05pm; they may have held the shares until a later time when the shares appreciated; or they may continue to hold those securities today.  Some of those purchasers may have hedged their Neurotrope purchases with other derivatives, which minimized or eliminated any losses.  And

some of these purchasers may have themselves been covering short positions expecting the price of Neurotrope stock to drop. Resolving these factual issues and identifying the persons who actually suffered pecuniary harm during that 65 minute time period "would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3664(c)(1).

## FORFEITURE AND FINE

The parties agree that a forfeiture money judgement is appropriate and have agreed on an appropriate range for the amount of the judgment. (Dkt. 6 at 7; PSR ¶ 8.) The "core concept" of forfeiture is that an offender should not be able to benefit from the "ill-gotten gains" of his criminal behavior. *United States v. Young*, 330 F. Supp.3d 424, 429 (D.D.C. 2018) *citing United States v. Monsanto*, 491 U.S. 600, 616 (1989). *Cf. Xiong v. United States Dep't of Treasury*, No. 20-CV-1346-ABJ, 2022 WL 1538701 at *5 (D.D.C. May 16, 2022) ("while forfeiture is directed towards disgorging ill-gotten gains, restitution is directed towards compensating the victim's losses"). Here, the correct amount of forfeiture is the actual gains realized by the Defendant from the trades that he executed with the benefit of inside information between 12:59pm and 2:05pm. That amount is $328,701.16.[10] (Ex. 1 ¶ 7.)

The maximum fine for the offense of insider trading is $5,00,000 or twice the pecuniary gain or loss of the offense pursuant to 18 U.S.C. § 3571(b). Given that the pecuniary gain to the Defendant was $328,701.16, the Government submits that a fine of $657,402.31, or twice the

---

[10] The Government expects that the Defendant will contend that for purposes of calculating forfeiture the Court should begin with the amount of Haywood's gains ($328,701.16) and then deduct the hypothetical amount of money that Haywood would have made from selling the same number of Neurotrope shares at the end of the trading day at the closing price of $1.42 per share ($149,403.97); which produces an amount of $179,297.18. This approach to calculating forfeiture is wildly speculative. It assumes that Haywood would have waited until the end of the trading day to sell his shares (rather than starting his selloff earlier). Reliance on the $1.42 closing price is entirely arbitrary. As a factual matter, Haywood did not sell any shares—not one of them—at the closing price of $1.42 per share. And the price of the stock had dropped even lower than $1.42 per share before closing.

14

amount of the Defendant's gains would be an appropriate amount, and necessary to deter future misconduct.

## CONCLUSION

For the reasons set forth above, the Government recommends that the Court impose a sentence of imprisonment of 27 months' incarceration, and 3 years of supervised release, coupled with a fine of $657,402.31. The government further recommends that the Court enter a forfeiture money judgement of $328,701.16 and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:   /s/
Elizabeth Aloi
John Borchert
Assistant United States Attorneys
601 D Street, N.W.,
Washington, D.C. 20530
(202) 252-7212 (Aloi)
(202) 252-7679 (Borchert)
Elizabeth.Aloi@usdoj.gov
John.Borchert@usdoj.gov